## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 05 2020, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael H. Michmerhuizen
Barrett McNagny LLP
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

John M. Haecker
Squiller & Hamilton, LLP
Auburn, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dustin Westafer,

*Appellant-Respondent,*

v.

Amy M. Westafer,

*Appellee-Petitioner.*

March 5, 2020

Court of Appeals Case No.
19A-DC-2254

Appeal from the Noble Superior Court

The Honorable Randy L. Coffey, Special Judge

Trial Court Cause No.
57D02-1901-DC-1

**Najam, Judge.**

## Statement of the Case

[1]     Dustin Westafer ("Father") appeals the trial court's denial of his petition for modification of custody over his minor children following the dissolution of his

marriage to Amy M. Westafer ("Mother"). Father raises three issues for our review:

1. Whether the trial court abused its discretion when it denied his petition to modify custody.

2. Whether the trial court erred when it imputed income to Father and increased his child support obligation.

3. Whether the trial court erred when it ordered Father to pay a portion of Mother's attorney's fees.

[2] We affirm.

## Facts and Procedural History

[3] Father and Mother were married, and they have two minor children together, T.W., born June 30, 2013, and Z.W., born March 21, 2015 (collectively, the "Children"). In 2017, the trial court entered a decree dissolving the parties' marriage. In that decree, the court ordered that the parties would share legal custody of the Children. The court also ordered that Mother would have physical custody of the Children but granted Father parenting time on two evenings per week and alternating weekends. The court then ordered Father to pay $115 per week in child support.

[4] Mother is a registered nurse. At the time the court dissolved the parties' marriage, Mother worked three eight-hour-days per week. But shortly thereafter, Mother's schedule changed, and she now works two twelve-hour

shifts per week on rotating days and every third weekend.[1] Father markets and sells nutritional supplements and has a flexible work schedule. Due to Mother's new schedule and Father's flexibility, Mother and Father no longer follow the court's order regarding parenting time. Rather, the Children now spend nearly half of their time with Father.

[5] While the parties were married, they lived at Mother's parents' house in Albion. After the dissolution, Father moved to Warsaw. In March 2018, Mother moved from her parent's house to a house in Kendallville. Thereafter, Father remarried, and he and his new wife, Jennifer, moved to a home in Fort Wayne in December. The home Father and Jennifer live in is owned by Jennifer's father and has a rental value of $7,500 to $10,000 per month. However, Father and Jennifer do not pay any rent, and Jennifer's father pays all of the utilities and lawn and pool maintenance. Father's new home is approximately forty-five minutes from Mother's home. *See* Ex. Vol. IV at 196. Sometime after Father married Jennifer, Jennifer's mother gave them a joint investment account worth more than $26,900, and Jennifer's father gave Father $15,000.

[6] In early 2018, Father and Mother discussed schooling options for the Children. Mother indicated that she wanted the Children to attend St. Mary's, a private Catholic school near her home. Father, who is not Catholic, stated that he did

---

[1] Mother works Tuesdays and Saturdays one week, then Sundays and Thursdays the second week, and Mondays and Tuesdays during the third week.

not want the children to attend St. Mary's both because it is a Catholic school and because it is forty minutes away from Father's home in Fort Wayne. Instead, Father wanted the Children to attend Canterbury, a private nondenominational Christian school near his home. Mother and Father also disagreed about the appropriate age for Z.W. to start kindergarten. Father wanted Z.W. to start kindergarten at the age of five, while Mother wanted Z.W. to wait to start kindergarten when he was six years old. Mother ultimately enrolled the Children at St. Mary's.

[7] On May 31, Father filed a petition to modify custody and parenting time. However, on December 3, Father filed a motion to dismiss that filing without prejudice because the motion was "no longer necessary." Appellant's App. Vol. II at 43. The court granted Father's motion to dismiss. Then, on December 21, Father filed a second petition to modify custody, parenting time, and child support. In that petition, Father asserted that "there has been a substantial change" in one or more of the factors that a court may consider in initially determining custody. *Id*. at 45. Specifically, Father asserted that: the parties have been following a different parenting time schedule for nearly one year, the parties disagree on what school the Children should attend, and Father's schedule and home "would provide for and [are] better suited for the Children." *Id*. at 46. Father also requested that the court recalculate his child support obligation and award him attorney's fees.

[8] The trial court held a hearing on Father's petition. During the hearing, Father testified about the amount of time the Children would spend in the car if Father

had to transport them to St. Mary's from his house.  Specifically, Father testified that T.W. would spend an hour and twenty minutes in the car going to St. Mary's and back and that Z.W. would spend "double that" on days he attended preschool.  Tr. Vol. II at 61.  In addition, Father presented as evidence the testimony of Doctor John Newbauer, a custody consultant.  Dr. Newbauer recommended that Father have primary physical custody because of the "opportunity" for the Children to attend Canterbury, Father's and Jennifer's flexible work schedules that can "adjust" to meet the Children's needs, and because "there'd be less interruption with the [C]hildren's schedules[.]"  *Id*. at 22.

[9]     Following the hearing, the trial court entered the following findings of fact and conclusions thereon:

> **APPLICABLE FACTS:**
>
> 15.  Although granted parenting time as set out in the Indiana Parenting Time Guidelines, [Father] exercises parenting time with the children much more often than set out therein.  The children spend nearly half of their time with their father.  This is done with [Mother's] consent.  The extra parenting time occurs because of [Mother's] work schedule, [Mother's] generosity concerning the exercise of parenting time, and [Father's] ability and desire to have the children in his presence, rather than have the children in a daycare or under the supervision of one of [Mother's] relatives.
>
> 16.  The children attend daycare, preschool, and/or school at a Catholic school in Avilla, Indiana (St. Mary's).  Both [Mother]

and [Father] take responsibility for transporting the children to and from the school.

17. Because of his lack of regular work hours, his access to Jennifer Westafer's income, and his expense-free living situation, [Father] has the time and money to enroll the children in an exclusive, private, expensive, highly regarded, non-denominational Christian school located in southwest Fort Wayne (Canterbury). The school is close to [Father] and Jennifer's current residence. [Father] and Jennifer Westafer both prefer that the children attend this school, especially since they often transport the children to school, and the school is much closer to their home. As an alternative, [Father] suggests, for his convenience, that the children attend school in the Aboite-Homestead schools of southwest Fort Wayne.

18. The Canterbury school, St. Mary's Catholic school, and the Aboite-Homestead schools all have excellent ratings and recommendations. Any of these systems would provide a first-rate education for the children.

19. The St. Mary's system has done no harm whatsoever to the children.

* * *

27. Dr. Newbauer proffered an opinion on custody and parenting time for the children. The opinion is based upon his evaluation of the facts, and not the mental conditions and personality traits of the parties. Primarily he supports his conclusions and recommendations contained in the report by passing judgment based upon ". . . the distance between the parent's homes . . ." and on his belief that ". . . the opportunities at Canterbury and Southwest Allen County **seem to me** to be even better in the long run." [Emphasis added.]

28. Dr. Newbauer's opinion does not appear to be based upon his expertise or education; instead it appears to be his attempt to substitute his judgment for that required of the Court. Nothing about Dr. Newbauer's past training puts him in a position to decide issues outside of his area of expertise. Dr. Newbauer's judgment concerning which school is best for the children has nothing to do with his training as a psychologist or child custody evaluator. And certainly, the conclusion concerning the children's travel (which exists because the Father's wish to have extra time with the children, coupled with the Father's decision to live in southwest Fort Wayne) does not demand a doctorate degree in counseling and guidance.

29. [Mother] earned $30,514 in 2018.

30. [Father] earned $23,248 in 2017 and $10,970 in 2018 (after business deductions and expenses).

31. [Father] holds a bachelor's degree. He has potential to earn much more than he actually earns. Additionally, from his business earnings, he takes substantial deductions for travel, advertising, and the like. [Father] also benefits from the charity of his current wife's family, including gifts of money ($15,000.00 in December of 2018) and the cost-free use of his father-in-law's property. [Father] lives with a much more enhanced lifestyle than his impoverished income would support.

* * *

**DISCUSSION:**

* * *

41.  In part, this custody battle between the parties exists because the children that are the subject of this cause were raised in the Catholic Church and were baptized as Catholics.  Although the children are not placed in any physical or emotional danger by attending a Catholic school or Catholic mass, [Father] insists that the children no longer be Catholic or participate in the ceremonies operating with the Church.  Because [Mother] insists that the children remain Catholic (as they have always been), [Father] asserts that [Mother] is unwilling to make joint decisions with him as required by the joint custody agreement.  To the contrary, it seems that the parties long ago decid[ed] **jointly** that the children would be raised as Catholics.  It is [Father] that is being the obstinate and mulish party by insisting that the decision concerning Catholicism be changed simply because he has decided to be a protestant Christian.

42. Otherwise, this custody battle exists because [Father] has a new life with a new wife.  The new life and its lifestyle entails living in an elegant house with grand amenities.  The new house if much farther from Noble County, where the parties resided during the marriage.  With the new life comes economic freedom which allows [Father] a carefree employment situation.  This in turn allows [Father] more time to have the children when they would otherwise have to be in work-related daycare.  In other words, [Father] can and would pamper and perhaps indulge the children more than [Mother] can because of this freedom.  He believes he can provide the best of everything for the children.  As such, he believes what he would provide is in the children's best interests.  [Father] appears to define "the best" solely upon the new-found ability to share his and his wife's available wealth with the children.

43.  There are some changed circumstances that have come to exist since the Court granted the parties their dissolution of marriage.  [Mother] must work to survive, and has found reasonable employment involving her trained profession.

[Father] has a new wife and a new house and a new religion, and with these three things, a new way of life. [Father] now has time on his hands.

* * *

45. None of the changed conditions have shown that the current order of custody is not in the children's best interests. In fact, the children seem to thrive under the circumstances existing and that have existed.

46. The current custody order appears to be in the children's best interest, especially in light of [Mother's] liberal attitude toward [Father's] parenting time. Further, the court recognizes that a large portion of the children living in the United States attend some sort of daycare. Attending daycare is normal. The fact that a child may or must attend daycare while a parent works is not found to be a substantial change in conditions that warrant a change in custody. Should [Father] prefer not to travel to have his children during [Mother's] work hours, the children certainly could, like millions of other children throughout the United States, be in daycare. This would also solve [Father's] travel dilemma that he finds to be so troubling. [Father's] choice to have the children with him rather than have the children stay with [Mother's] family or at a daycare during her work hours, while commendable, is not a reason to change the custody arrangement or order.

47. The fact that the children will not or cannot attend the Canterbury school is not a reason for a change of custody. Just as not every lawyer can go to Harvard Law School, not all children have to go to the best school. Many fine lawyers did not go to Harvard, many great psychologists went to Ball State rather than Stanford University, and many bright children have had the best educations without having to go to Canterbury. Further,

while [Father] and Dr. Newbauer laud the merits of Canterbury, many other citizens of northeast Indiana would also applaud the virtues of their own schools. Again, the Court should not change custody just so that the children can become proud parents at the Canterbury schools.

48. . . . [C]ontinuity in custody is a key element in determining what is in the best interests of a child. Moreover, . . . most if not all changed conditions forwarded by [Father] are not sufficient to cause a change of custody. For example, [Father's] move to Fort Wayne, and the inconvenience that may cause him, is not sufficient to warrant a change of custody. The changes in [Father's] monetary and social status is not sufficient to modify custody. The change in [Father's] religious beliefs or wish for the children's educational training should not be a basis for modification of custody.

49. This cause ferments quickly. [Father] is proud of his current living situation. He does not want to change that situation to accommodate [Mother's] living situation. The Court understands [Father's] satisfaction with that situation. Also, he and his wife Jennifer want to spend as much time with his children as possible and do for them as much as possible. The Court understands that wish also. However, [Father] wants the Court to require [Mother] to bend to his wishes. [Father's] wishes and dreams for his children and his belief that, he, above all, knows what is best for those children, do not create a reason to change the custody order.

* * *

51. [Mother] requests an award of attorney fees and other costs, including deposition fees and fees for an appraisal. Due to [Mother's] income, and due to the great burden imposed on her in defending this action, coupled with [Father's] current lack of

any appreciable living expenses, [Father] should contribute toward a portion of those fees.

52. [Father] provided the Court with a Child Support Obligation Worksheet. That worksheet attributes weekly income to [Father] of $295.00 per week and to [Mother] of $594.00 per week. It ignores [Father's] in-kind income, his lack of living expenses, his substantial deductions for expenses from his gross receipts, and the gifts of his in-laws. Because of the same, the Court finds that it should not consider that worksheet in determining whether to modify child support.

53. [Mother] provided the Court with a Child Support Obligation Worksheet. That worksheet attributes weekly income to [Father] of $1,900.31 per week and to [Mother] of $646.272 [sic] per week. It properly attributes [Father's] in-kind income, his lack of living expenses, his substantial deductions for expenses from his gross receipts, and the gifts of his in-laws. It also considers the potential income attainable by [Father] should he choose to work fulltime and use the college degree he earned. Because of the same, the Court finds that it should use this worksheet in determining whether to modify child support.

54. [Father] has a current child support obligation of $115.00.

55. . . . The old amount [of child support] differs by more than twenty percent (20%) from the new computation. The modification should be granted. . . .

Appellant's App. Vol. II at 16-27 (some alterations and omissions in original).

Accordingly, the court denied Father's motion to modify custody, increased

Father's child support obligation to $272.00 per week, and ordered Father to

pay $5,000 of Mother's attorney's fees.  The court also denied Father's request

for attorney's fees.  This appeal ensued.

# Discussion and Decision

## Issue One:  Modification of Custody

Father first contends that the trial court abused its discretion when it denied his

petition to modify custody.[2]  As our Supreme Court has explained:

> [T]here is a well-established preference in Indiana for granting
> latitude and deference to our trial judges in family law matters.
> Appellate courts are in a poor position to look at a cold transcript
> of the record and conclude that the trial judge, who saw the
> witnesses, observed their demeanor, and scrutinized their
> testimony as it came from the witness stand, did not properly
> understand the significance of the evidence.  On appeal, it is not
> enough that the evidence might support some other conclusion,
> but it must positively require the conclusion contended for by
> appellant before there is a basis for reversal.  Appellate judges are
> not to reweigh the evidence nor reassess witness credibility, and
> the evidence should be viewed most favorably to the judgment.

*Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (quotation marks and

citations omitted).  Further, where, as here, the trial court entered findings of

---

[2] Father first appears to assert that the trial court erred when it concluded that it could not consider events that had occurred prior to the date Father filed a motion to dismiss his first motion to modify custody. Father maintains that he did not make a "judicial admission" when he filed that motion to dismiss and, as such, the court should have considered changes in conditions that had occurred prior to that date. Appellant's Br. at 26.  However, the court did consider events that had occurred prior to the date Father filed his motion to dismiss the first petition, and the court concluded that no substantial change in circumstances had occurred "regardless of which date" it considered.  Appellant's App. Vol. II at 24.  Father has not shown any error on this issue.

fact and conclusions thereon, we apply "a two-tiered standard of review that asks whether the evidence supports the findings, and whether the findings support the judgment." *Id*. at 123.

[11] The party seeking to modify custody bears the burden of demonstrating the existing custody should be altered. *Id*. at 124. "[T]his 'more stringent standard' is required to support a change in custody, as opposed to an initial custody determination[] where there is no presumption for either parent because 'permanence and stability are considered best for the welfare and happiness of the child.'" *Id*. (quoting *Lamb v. Wenning*, 600 N.E.2d 96, 98 (Ind. 1992)).

[12] Pursuant to Indiana Code Section 31-17-2-21, a trial court may not modify a child custody order unless the modification is in the best interests of the Children and there is a substantial change in one or more of the factors enumerated in Indiana Code Section 31-17-2-8. And Section 8 provides that the court shall consider the following factors: the age and sex of the children; the wishes of the children's parent or parents; the wishes of the children, with more consideration given if the children are at least fourteen years of age; the interaction and interrelationship of the children with the their parents, sibling, and any other person who may significantly affect their best interests; the children's adjustment to the their home, school, and community; the mental and physical health of all individuals involved; evidence of a pattern of domestic or family violence by either parent; evidence that the children have been cared for a by de facto custodian; and a designation in a power of attorney of the children's parent or de facto custodian. Ind. Code § 31-17-2-8 (2019).

[13] On appeal, Father contends that the court erred when it found that no substantial change had occurred. Specifically, Father maintains that the Children started a new school in a new town, that Mother and Father disagreed about the age Z.W. should start kindergarten, that Mother moved without providing notice to Father, and that the parties were not exercising parenting time as provided for in the original custody order. Father maintains that those are "substantial changes warranting revisiting custody[.]" Appellant's Br. at 29.[3]

[14] Here, the trial court acknowledged that, since the dissolution of the parties' marriage, both Mother and Father had moved, the Children have started at a Catholic school that Father "prefer[s]" the Children not attend, and Father exercises parenting time "much more often" than set out in the original order. Appellant's App. Vol. II at 18. However, the court also concluded that "the changed conditions forwarded by [Father] are not sufficient to cause a change of custody." *Id*. at 25. And it is not our role to substitute our judgment for the court's. *See Gertiser v. Gertiser (In re Marriage of Gertiser)*, 45 N.E.3d 363, 369

---

[3] Father also asserts that "Mother is not including Father in the decision making" and that that warranted a change in custody. Appellant's Br. at 33. Specifically, Father contends that Mother relocated without notifying him and that Mother enrolled Children in St. Mary's without Father's participation. Mother acknowledges that she did not file a notice of change of residence with the trial court. However, Mother testified that she notified Father that she had purchased the home before she moved. Tr. Vol. III at 7; *see also* Ex. Vol. VI at 10. Further, the evidence demonstrates that, while Father did not want the Children to attend St. Mary's, he ultimately "agreed" that Mother could enroll T.W. in preschool there. Tr. Vol. II at 154.

(Ind. 2015). Rather, our role is "only to determine whether the evidence supports the findings and whether those findings support the judgment." *Id.*

[15] And the evidence shows that, since the parties dissolved their marriage, Mother moved to a house that was "approximately a mile" away from the hospital where she works and near the Children's cousins that the Children see "[w]eekly." Tr. Vol. II at 176, 183. The evidence also demonstrates that, while Father wanted the Children to attend a prestigious Christian school near his home, the school Mother chose for the Children is "identified" by the State of Indiana "as an 'A' school" and a "4 Star school." Tr. Vol. III at 54.

[16] The evidence further demonstrates that, while Mother's work schedule has changed since the dissolution of the marriage, she now works two twelve-hour days per week on a three-week rotating schedule and every third weekend, which schedule would only change if she needed it to. The evidence also demonstrates that Father exercises additional parenting time because of Mother's work schedule and because Father had "concerns" about Mother's father watching the Children while Mother was at work. *Id.* at 61.

[17] That evidence supports the trial court's thorough and extensive findings, and the findings support the conclusion that there has not been a substantial change in conditions and that modification is not in the Children's best interests.[4] The

---

[4] Father also asserts that several of the trial court's findings are not supported by the evidence. However, Father does not show how those challenged findings are material to his petition.

findings and conclusions are not clearly erroneous, and the trial court did not otherwise abuse its discretion when it denied Father's motion to modify custody.

## Issue Two:  Child Support Obligation

[18]  Father next asserts that the trial court erred when it modified Father's child support obligation.  As this Court has stated:

> Child support calculations are made utilizing the income shares model set forth in the Indiana Child Support Guidelines.  The Guidelines apportion the cost of supporting children between the parties according to their means, on the premise that children should receive the same portion of parental income after a dissolution that they would have received if the family had remained intact.  The trial court is vested with broad discretion in making child support determinations.  A calculation of child support under the Guidelines is presumed to be valid.
>
> We will reverse a trial court's grant or denial of a request for modification of child support only where the court has abused its discretion.  An abuse of discretion occurs when the trial court misinterprets the law or the decision is clearly against the logic and effects of the facts and circumstances before the court.  We do not reweigh the evidence or judge the credibility of the witnesses upon review; rather, we consider only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom.

*Sandlin v. Sandlin*, 972 N.E.2d 371, 374-75 (Ind. Ct. App. 2012) (citations omitted).

[19]     On appeal, Father asserts that the trial court erred when it calculated his child support obligation because it improperly: (1) imputed potential income to him; (2) included one-half the rental value of his home; and (3) included gifts Father had received from his in-laws when it determined his weekly gross income. We address each argument in turn.

## Potential Income

[20]     Father first asserts that the trial court erred when it imputed potential income to him. It is well settled that the trial court "may impute income to a parent for the purposes of calculating child support upon a determination that he or she is voluntarily underemployed." *Id*. at 375. The purpose of imputing income is to discourage parents from avoiding significant child support obligations by being unemployed or taking a lower paying job. *Id*. However, the Guidelines do not require or encourage parents to make career decisions based strictly upon the size of potential paychecks, nor do the Guidelines require that parents work to their full economic potential. *See id*. To determine whether potential income should be imputed, the trial court should review the obligor's work history, occupational qualifications, prevailing job opportunities, and earning levels in the community. *Id*.

[21]     Here, both parties presented child support obligation worksheets to the trial court. The trial court declined to follow Father's worksheet because it "ignore[d]" several factors. Appellant's App. Vol. II at 26. Rather, the court decided to use Mother's worksheet. In its order, the court noted that Mother's worksheet "consider[ed] the potential income attainable by [Father] should he

choose to work fulltime and use the college degree that he earned." *Id.* Based on that statement, Father contends that the court imputed potential income to him, which he contends was erroneous because the trial court did not find that he was underemployed and because there was no evidence of Father's qualifications, prevailing job opportunities, or earning levels in his community. However, contrary to Father's assertions, the trial court did not impute potential income to him.

[22] The trial court explicitly adopted Mother's child support worksheet, which attributed a weekly income to Father in the amount of $1,900.31. In reaching that income, Mother used the following calculation:

> in 2018 Advocare income of $17,826 (including $6,136 car and truck expenses added back); gift of $4,375 per month (one-half of rental value of residence); $15,000 gift from R. Bruce Dye 12-28-18; and $13,490.27 (half of $26,908.54 value of gift from Jennifer Westafer's mother in 2018); total is $98.816.27 which is $1,900.31 per week.

Ex. Vol. IV at 124.

[23] That calculation does not include any potential income as a result of Father's unemployment or underemployment. Rather, it only included Father's actual income from 2018, one-half of the rental value of his house, and gifts from his in-laws. Thus, it is clear that, despite the court's reference to "potential income" in its order, the trial court did not actually impute any potential income to Father when it calculated his child support obligation.

## Rental Value of Home

[24] Father next asserts that the trial court erred when it imputed income to him in the amount equal to one-half the rental value of his home. Specifically, Father contends that it was "clearly not appropriate to impute the actual rental value as income; even if one accepts the premise that Father would have to pay $4,375 in rent, that does not put $4,375 in Father's pocket every month or make $4,375 available to pay child support." Appellant's Br. at 50.

[25] The Indiana Supreme Court has previously addressed a similar situation. In *Glass v. Oeder*, Glass lived rent-free in a house that was owned by a trust. The trial court found that the value of the rent Glass was not paying was imputed income in the amount $18,000. 716 N.E.2d 413, 417 (Ind. 1999). Glass appealed, and our Supreme Court held that his rent-free living arrangement "provides him with a lower living cost that presumably frees up money for the support of his children and was a proper basis for the trial court to impute income." *Id*. In reaching that conclusion, the Court relied on the Indiana Child Support Guidelines' statement that "'regular and continuing payments made by a family member, subsequent spouse, roommate, or live-in friend that reduce the parent's cost for rent, utilities, or groceries, should be the basis for imputing income.'" *Id*. (quoting Ind. Child Supp. G. 3(A) Cmt. 2(E)).

[26] Similarly, here, Father's father-in-law owns Father's house and allows Father to live in the house without paying rent or utilities. Those regular and continuing payments made by Father's father-in-law provided Father with a lower cost of living. *See id*. And because Father does not have to pay rent or utilities, the

trial court was free to presume that Father has additional money for child support. As such, we cannot say that the trial court clearly erred when it imputed one-half of the rental value of the home to Father.

[27] Still, Father asserts that it was error for the court to impute half the value of the rental property, $4,735.00, because that amount exceeds his actual income. But Father has not cited any authority to support his position that a trial court cannot impute the full benefit of the rental value of a home simply because that home is worth more than Father could afford if he had to pay rent. Rather, as discussed above, Father received a benefit that lowered his cost of living, and the court did not abuse its discretion when it imputed that benefit to Father.

Gifts from Father's In-Laws

[28] Father further contends that the trial court erred when it included the value of in-kind gifts he received from Jennifer's parents. Specifically, Father asserts that there was "no evidence" that the gifts from Father's in-laws, which included $15,000 and one-half the value of an investment account, "were regular and continuing payments[.]" Appellant's Br. at 51. To support his assertion, Father relies on the commentary to the Indiana Child Support Guidelines, which states that it "may be inappropriate to include as gross income occasional gifts received." Ind. Child Supp. G. 3(A) cmt. (d).

[29] However, other than quoting that portion of the commentary to the Child Support Guidelines, Father has not cited any authority to support his position that the trial court was precluded from considering one-time gifts or that the

court otherwise abused its wide discretion when it included two large monetary gifts from Father's in-laws in its calculation of Father's weekly gross income. Rather, the commentary cited by Father states that it *may* be inappropriate to consider one-time gifts. It does not prohibit the court from considering occasional gifts. Further, the Child Support Guidelines define weekly gross income to include "income from any source," including "gifts." Ind. Child Supp. G. 3(A)(1). And, the commentary states that "[w]hether or not the value of in-kind gifts should be included in a parent's weekly gross income is fact-sensitive and requires careful consideration of the evidence in each case." Ind. Child Supp. G. 3(A) cmt. (d).

[30] Here, the trial court carefully considered the facts of this case, including the fact that Father lives rent-free and that he has received two large monetary gifts from his in-laws while Mother only earns $30,000 per year. Father has not met his burden on appeal to demonstrate that the court abused its discretion when it included those gifts in its calculation of his weekly gross income. We therefore affirm the court's order increasing Father's child support obligation.

### Issue Three: Attorney's Fees

[31] Finally, Father asserts that the trial court erred when it ordered him to pay a portion of Mother's attorney's fees. As this Court has stated:

> A determination regarding attorney fees in proceedings to modify a child support award is within the sound discretion of the trial court and will be reversed only upon a showing of a clear abuse of that discretion. In determining whether to award attorney fees, the trial court must consider the parties' resources, their

economic condition, their ability to engage in gainful employment, and other factors that bear on the award's reasonableness.

*Martinez v. Deeter*, 968 N.E.2d 799, 810 (Ind. Ct. App. 2012) (citations omitted). "Consideration of these factors promotes the legislative purpose behind the award of attorney fees, which is to insure that a party in a dissolution proceeding, who would not otherwise be able to afford an attorney, is able to retain representation." *Goodman v. Goodman*, 94 N.E.3d 733, 751 (Ind. Ct. App. 2018)*, trans. denied.*

[32] Here, the trial court ordered Father to pay $5,000, or approximately fifty percent, of Mother's attorney's fees and litigation expenses. Father asserts that that was an abuse of discretion because "Mother makes more income than Father," there was no burden on Mother to defend the action because "she wanted the Court to decide," the trial court "made up for" Father's lack of living expenses when it imputed income to Father in its child support calculation, and there was no evidence that Mother was unable to pay her attorney. Appellant's Br. at 52.

[33] However, the court considered the parties' respective resources and economic conditions. Indeed, the court found that Father earned $23,248 in 2017 and $10,970 in 2018, and the court found that Mother earned $30,514 in 2018. But the court also found that Mother "must work to survive" while Father has a "current lack of any appreciable living expenses." Appellant's App. Vol. II at 24, 26. Based on those factors, the court found that Father should pay a portion

of Mother's attorney's fees. We conclude that the trial court did not abuse its discretion, and we affirm the court's order that Father pay $5,000 of Mother's attorney's fees.

## Conclusion

[34] In sum, the trial court did not abuse its discretion when it denied Father's request to modify custody. Further, the court did not err when it calculated Father's child support obligation. And the court did not abuse its discretion when it ordered Father to pay a portion of Mother's attorney's fees. We affirm the trial court's order.

[35] Affirmed.

Vaidik, J., and Tavitas, J., concur.